The STATE of Ohio, Appellee,

v.

HAWN, Appellant.

[Cite as *State v. Hawn* (2000), 138 Ohio App.3d 449.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 17722.

Decided June 30, 2000.

450

453

Mathias H. Heck, Jr., Montgomery County Prosecuting Attorney, and Cheryl A. Ross, Assistant Prosecuting Attorney, for appellee.

David C. Greer and Carla J. Morman, for appellant.

GRADY, Presiding Judge.

Stephen James Hawn was found guilty by a jury of murder with a firearm specification. The Montgomery County Common Pleas Court sentenced Hawn,

and he has now timely appealed to this court. The following is a summary of the evidence presented at trial.

## State's Case

On the night of February 21, 1998, the Montgomery County Sheriff's Office received a 911 call from Stephen Hawn, who reported that his girlfriend, Sue Jack, had just committed suicide. When police arrived at the residence that Hawn and Jack had shared, they encountered Hawn in the hallway, clad only in a shirt and boxer shorts. Hawn had blood on his clothes and on his hands. Police entered the bedroom of the home and found the deceased, Jack, lying on the floor at the foot of the bed with a gunshot wound to the chest. Some of the bed clothes were on the floor and some were draped over a desk across the room from the bed. Electronic remote controls, one broken, and pieces of a broken fan, were on the floor. On the bed was a telephone off its hook. A .44 caliber Smith and Wesson revolver was found near Jack's foot.

When officers on the scene talked with Hawn, he first indicated that he had discovered Jack's body when he arrived home. He then changed his story, stating that he was in bed watching television when Jack took the gun from the nightstand and shot herself in the chest. When Hawn heard the shot go off, he jumped out of bed, ran over to Jack, and held her before calling police.

An autopsy of Jack's body revealed that the cause of her death was a gunshot wound to the chest. The autopsy did not reveal any gun powder residue on Jack's clothing or skin near the entrance wound or inside the wound track itself, which would be indicative of a close-range or contact shot. Jack's death was ruled a homicide. Based upon his test firings of the weapon and his examination of Jack's clothing, firearms expert Chris Monturo opined that the gun was more than five feet away when it was fired into Jack's chest.

The nearly two-year relationship between Jack and Hawn had been on-again, off-again, characterized by periods of dating or living together followed by periods of separation. On the day of her death, Jack had been happy and laughing, and was planning in the future to buy a condominium, have her vision corrected via laser surgery, and to support her sister's fight against breast cancer.

## Hawn's Case

Hawn and Jack had dinner at the Old Hickory restaurant on North Main Street on the night of the shooting. They were there from 6:30 p.m. until 10:30 p.m., and discussed their future wedding plans during dinner. The evening was going very well and Jack and Hawn were happy and having a good time until one of Hawn's friends made a comment about Hawn's former girlfriend, Bethany.

That caused Jack's mood to darken, and she and Hawn did not speak on the twenty-five-minute drive home.

Upon arriving home, Hawn undressed, got into bed, and began watching television. The remote controls were lying on top of the bedcover. When Jack came out of the bathroom, she walked over to Hawn and slapped him, saying she never wanted to hear the name "Bethany" again. Jack then struck a small plastic fan that was sitting on the floor, knocking it across the room.

Jack next took Hawn's .44 caliber revolver from the nightstand and walked to the foot of the bed. Hawn had begun to roll over to get out of bed when a shot went off. Hawn threw the covers aside and ran over to Jack, holding her briefly before calling 911 for help. Jack died before help arrived.

At the trial, Hawn presented two firearms experts who had tested the gun. They opined that the wound to Jack's chest was the result of a contact or close range shot with the gun barrel being less than two inches away when the gun was fired.

Hawn also presented evidence demonstrating Jack's impulsivity and dramatic mood swings, particularly when she drank alcohol. Jack's blood-alcohol level was .257 at the time of this shooting. Hawn also presented evidence that Jack had previously attempted suicide in 1982 and had contemplated suicide in 1991, in the fall of 1996, and again as recently as two weeks before this shooting, and that Jack exhibited many risk factors for suicide.

From his conviction and sentence for murder with a firearm specification, Stephen Hawn has appealed to this court, asserting nine assignments of error for our consideration.

## First Assignment of Error

"The trial court erred in permitting evidence of prejudicial 'other acts' thereby denying appellant Hawn his rights to due process of law and to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section [16] of the Ohio Constitution."

## Second Assignment of Error

"The trial court erred in permitting prejudicial testimony as to the decedent's state of mind thereby denying appellant Hawn his rights to due process of law and to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution."

### Third Assignment of Error

"The trial court erred in permitting irrelevant and prejudicial testimony thereby denying appellant Hawn his right to due process of law and to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution."

Hawn's first, second, and third assignments of error each concern evidence of Hawn's alleged prior physical abuse of Jack and her fear of him. Hawn filed a motion *in limine* prior to trial seeking to exclude the evidence as hearsay. The state argued that the evidence was nevertheless admissible per Evid.R. 803(3), as evidence of Jack's state of mind. The trial court ruled that the state could introduce evidence of Jack's state of mind, but that per *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394, the state was barred from introducing evidence of why Jack was possessed of that state of mind, that is, why she feared Hawn.

Again during trial, but before the state's witnesses testified, Hawn renewed his objection to testimony regarding his alleged previous altercations with Jack, particularly incidents in October 1996 and November 1997. Hawn also objected that this evidence was not admissible per Evid.R 404(B) for the purposes stated therein. Once again, the trial court held that it would permit out-of-court statements that Jack made reflecting her fear of Hawn, but would not permit testimony relating to the reasons for that fear or any specifics about previous interactions between Hawn and Jack. The testimony that these witnesses then gave is discussed below.

Gary Gilliam–Beale testified that he operates a moving business specializing in "high risk" situations, such as moves by battered women. Gilliam–Beale went on to describe how he moved Jack's possessions out of Hawn's residence on October 17, 1996, and that he considered the move to be "hot" because he expected it to be a most threatening situation. Based upon his observations of Jack during the move, Gilliam–Beale testified that she was visibly shaken, pale, and trembled occasionally. He also testified that when his movers, who were working quickly due to the tense situation, would come around a corner and surprise Jack, she would jump or scream.

Fran Kender, a friend and coworker of Jack, testified that on the evening Jack moved out of Hawn's residence, Kender went to Harrigan's Tavern with her cellular phone to keep an eye on Hawn, who was there. Kender intended to call Jack if Hawn left the bar before the move was completed.

Lisa Tames, another of Jack's coworkers, testified that on October 18, 1996, the morning after Jack moved out of Hawn's residence, Jack began crying hysterically during a conversation they were having about Hawn.

Violet Gump, one of Jack's coworkers, testified that in April 1997, she was at the Lincoln Park Grille with Jack. When Jack saw Hawn sitting at the end of the bar, she became very, very frightened, her hands were shaking, and she told Gump that she wanted to leave.

Lieutenant Jeffrey Busch of the Montgomery County Sheriff's Office testified that on November 16, 1997, he responded to a domestic violence 911 call from Jack. When he arrived at Hawn's residence, Jack was upset and crying. Lt. Busch noted that Jack's face had a red area where she had possibly been struck.

Deputy Judy Sealey from the Montgomery County Sheriff's Office testified that she was dispatched to Hawn's residence on that same domestic violence call on November 16, 1997. Dep. Sealey testified that she spent a lot of time that night with Jack, advising Jack about her situation. Dep. Sealey told Jack how to file for a temporary protection order, gave her pamphlets on domestic violence and available shelters, and a list of people to contact for help, and advised Jack to change her phone number.

Laura Jack, Jack's sister, testified that on Thanksgiving Day 1997, Jack had a black eye. On another occasion, Jack showed Laura a bald spot on her head where, she said, Hawn had pulled a clump of hair from her head. Violet Gump also testified that after November 16, 1997, Jack had a black eye and a large clump of hair pulled out of the back of her head.

Lisa Tames also testified that after November 16, 1997, Jack came to work with a black eye and a patch of hair missing from her head. On January 30, 1998, Lisa Tames was at the Lincoln Park Grille with Jack and others from work. When Jack noticed that Hawn was also there, she became very nervous and anxious and left shortly thereafter.

The first, second, and third assignments of error argue that the trial court abused its discretion when, over the defendant's objections, the court admitted the testimony of these witnesses concerning Jack's fear of Hawn. Hawn argues that the evidence these witnesses offered is not admissible hearsay per Evid.R. 803(3), under the "state of mind" exception rule against hearsay. Hawn also argues that the evidence is inadmissible because the matters which this hearsay evidence portrays are extrinsic to the criminal conduct alleged and not otherwise admissible per Evid.R. 404(B) as evidence of his other crimes, wrongs, or acts.

■ A trial court has broad discretion with respect to the admission or exclusion of evidence, and its decision in such matters will not be reversed on appeal unless the trial court has abused its discretion and material prejudice has resulted therefrom. *State v. Hymore* (1967), 9 Ohio St.2d 122, 38 O.O.2d 298, 224 N.E.2d 126. The term "abuse of discretion" connotes more than simply an error of law or an error in judgment. It implies an arbitrary, unreasonable, or

unconscionable attitude on the part of the trial court. *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144.

Hearsay evidence, that is, evidence of an out-of-court statement or declaration made by a person other than the witness who testifies concerning it, is not admissible to prove the truth of the matter asserted. Evid.R. 801; Evid.R. 802. Specific exceptions to the rule against hearsay are provided by Evid.R. 803, which permits introduction of hearsay evidence to prove the truth of the matter asserted with respect to statements of a particular kind. Division (3) of Evid.R. 803 permits evidence of statements or declarations that the declarant made concerning his or her "then existing mental, emotional, or physical condition." Such statements are defined by the rule to include:

"A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

Evid.R. 803(3) codifies a hearsay exception comprehended by the common law *res gestae* rule, which permitted evidence of utterances that form the verbal part of an act. That exception to the rule against hearsay was permitted for two reasons. First, because the act, not the utterance, was the object of the proof. Second, because the spontaneous nature of the utterance invested it with reliability.

■ Evid.R. 803(3) preserves the spontaneity factor of the *res gestae* rule by requiring that the declaration concern a "then existing" condition. The rule does not expressly require that an act be the object of the proof offered. However, to the extent that proof of a subsequent act is its object, the utterance must be relevant to prove the act. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

■ State-of-mind evidence is relevant to prove a subsequent act if and to the extent that it supports an inference that the declarant subsequently acted on or out of that state of mind to engage in particular conduct alleged. To satisfy that requirement, the actor's conduct must conform in one or more material ways with the state of mind he previously declared. Absent that nexus, the evidence lacks the quality of *probability* in relation to the purpose for which it is offered that Evid.R. 401 requires for *relevant* evidence.

■ Evidence that another person declared a state of mind that is in its nature and character consistent with conduct in which the actor is alleged to have

subsequently engaged is not reasonably probative of a claim that the actor engaged in the conduct. Not having been made by the alleged actor, the declaration creates no probability that the actor was motivated by the prior state of mind he declared to subsequently engage in the conduct alleged. The separation of declarant and actor fatally undermines the basis of the inference that the evidence properly permits. Indeed, divorcing *declarant* from *actor* ignores the necessary unity of the two implied by the "verbal act" phenomenon that is the subject of the *res gestae* rule that Evid.R. 803(3) codifies.

The Supreme Court first permitted evidence concerning a murder victim's state of mind in *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394. There, six witnesses had been permitted to testify, over the defendant's objection, that the victim was fearful or apprehensive of the defendant. Without explanation, the court applied Evid.R. 803(3) to hold that "the testimony of state-of-mind witnesses, that the victim was fearful and apprehensive, was not inadmissible hearsay and was properly admitted." *Id.* at 22, 514 N.E.2d at 398. Professors Giannelli and Snyder have observed:

"Although the victim's statements satisfied the requirements for Rule 803(3), the Court failed to explain why the victim's fear of the defendant was relevant. The Court has noted in subsequent cases that, in *Apanovitch, it* 'limited this type of testimony to that reflecting the state of mind of the victim, but not the reasons underlying that state of mind.' *State v. Awkal,* 76 Ohio St.3d 324, 331, 667 N.E.2d 960 [967–968] (1996), cert. denied, 519 U.S. 1095, 117 S.Ct. 776, 136 L.Ed.2d 720 (1997). Accord *State v. Frazier,* 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 [1013–1014] (1995), cert. denied, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996). The Court in both cases failed to acknowledge the relevance issue." Giannelli and Snyder, Rules of Evidence Handbook (2000 Ed.), Authors' Comment to Evid.R. 803(3), at 322.

*Apanovitch* and subsequent cases which apply the same rule, *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960, and *State v. Frazier* (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000, and more recently *State v. Reynolds* (1998), 80 Ohio St.3d 670, 687 N.E.2d 1358, suggest that any relevance difficulty that evidence of the victim's declarations presents is cured by excluding evidence of *why* the victim feared his alleged murderer. That exclusion derives from the exception in Evid.R. 803(3) applicable to evidence of the reason for the declarant's "belief." The *belief* exception also appears in Fed.R.Evid. 803(3), and was discussed in *United States v. Cohen* (C.A.5, 1980), 631 F.2d 1223, on which *Apanovitch* relies. Significantly in *Cohen,* the declarant and the alleged actor were the same person, not different people as was the case in *Apanovitch, Awkal, Frazier,* and *Reynolds.*

The Supreme Court decided the same issue differently the year after *Apanovitch* was decided, in *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382. There, a defendant who was charged with murder was not allowed to introduce evidence that the alleged victim feared another person, which would suggest that the other person was the perpetrator. The Supreme Court found no error in excluding the evidence, stating: "Insofar as there may be derivative inferences favorable to appellant, it must be admitted that they would require the jury to speculate and not merely infer." *Id.* at 244, 530 N.E.2d at 394.

It is impossible to reconcile the holding in *Greer* excluding declarations that a murder victim made concerning his fearful state of mind with the holdings in *Apanovitch* and other cases permitting it. In *Apanovitch*, the evidence concerned the defendant and was offered by the state. In *Greer*, the evidence concerned someone else and was offered by the defendant. Nevertheless, in both cases the evidence was an out-of-court declaration that the victim had made reflecting his state of mind and was offered as probative of the defendant's guilt or innocence. The better view is stated in *Greer*: that evidence of the victim's declarations invites speculation with respect to those issues and should be excluded, no matter which party offers the evidence.

The application of Evid.R. 803(3) that *Apanovitch* and subsequent decisions approved presents a further problem. Proof that the victim feared the accused necessarily creates an inference that the accused had threatened or otherwise harmed the victim or someone else in order for that fear to have been instilled in the victim's mind. Such prior acts on the part of the accused are typically collateral to the criminal conduct alleged and, to the extent that they demonstrate a propensity to commit bad acts, are inadmissible per Evid.R. 404(A). That inference is not avoided by excluding evidence of the victim's actual reasons for fearing the accused, per *Apanovitch*. Indeed, that exclusion operates to lessen the burden of the party who offers evidence of the victim's state of mind. As that rule is now applied, it permits the state to introduce evidence of the defendant's bad character by inference, "through the back door," absent any responsibility for its accuracy.

With all due respect, we urge the Supreme Court to revisit the rule it applied in *Apanovitch, Awkal, Frazier,* and *Reynolds* permitting evidence that a murder victim feared the accused. As the court itself held in *Greer*, permitting evidence of a murder victim's fear of an accused to prove that the accused committed the murder invites speculation, not rational inference. The resulting benefits to the prosecution notwithstanding, the *Apanovitch* rule would benefit from some further review.

Nevertheless, we are required to follow the rule set out in *Apanovitch* and subsequent cases, and are thus required to hold that the trial court did not err

when it ruled that evidence of Jack's declarations that she feared Hawn were subject to the exception that Evid.R. 803(3) creates to the rule against hearsay. Whether the particular evidence that the state offered through its witnesses was properly admissible to prove that Hawn murdered Jack is another matter, however.

The fear that Jack manifested might amount to non-verbal declarations of her state of mind for purposes of Evid.R. 803(3). However, neither that rule nor the other exceptions to the rule against hearsay are rules of *relevance*. The hearsay evidence that they permit must nevertheless be relevant.

Hawn objected that evidence that Jack feared him as well as evidence of the hair pulling and black-eye injuries she allegedly suffered at his hands, and the testimony of police witnesses concerning Jack's domestic violence complaint, was irrelevant to prove the charges against him because it concerned matters wholly separate from the operative facts of the offense with which he was charged. The state responded that the evidence was nevertheless admissible per Evid.R. 404(B) as evidence of other crimes, wrongs, or acts probative of the perpetrator's identity, motive, intent, or the absence of mistake or accident. The court overruled that objection. We find that the court abused its discretion in so doing.

To be held criminally liable, a person must be found to have engaged in conduct prohibited by law with the requisite degree of culpability, if any, that the law prescribes. R.C. 2901.21(A). Those two elements of criminal liability are proved by evidence of the operative facts and circumstances of the offense alleged in the indictment or criminal complaint. Introducing evidence of matters extrinsic to those operative facts in order to prove the offense alleged violates the defendant's rights to due process. In particular, the state is prohibited by Evid.R. 404(A) from offering extrinsic evidence of the defendant's bad character to prove that the defendant engaged in conforming conduct to commit the crime alleged. However, the same evidence may be admissible per Evid.R 404(B) for the other, limited, collateral purposes specified therein, under certain circumstances. That rule states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Evid.R. 404(B) operates as an exception to the strict requirements of Evid.R. 404(A), which excludes evidence of a defendant's "bad character" or propensity to engage in bad conduct when it is offered by the state in its case-in-chief to prove that the defendant committed the crime alleged. The reason for

that exclusion is that the inference that evidence of the propensity permits, that the defendant *probably* committed the crime with which he is charged because the conduct alleged is consistent with his particular propensity, is too speculative to be fair and reasonable. Evid.R. 404(B) creates an exception for such evidence when it is, nevertheless, also probative of certain matters identified in the rule. However, the *matter* concerned must genuinely be in issue. *State v. Smith* (1992), 84 Ohio App.3d 647, 617 N.E.2d 1160. Further, the other act or acts offered as probative of the matter must themselves be temporally and circumstantially connected to the operative facts of the offense alleged. *State v. Burson* (1974), 38 Ohio St.2d 157, 67 O.O.2d 174, 311 N.E.2d 526; *State v. Curry* (1975), 43 Ohio St.2d 66, 72 O.O.2d 37, 330 N.E.2d 720; *Smith, supra.*

In response to Hawn's objection that the evidence that the state's witnesses would offer was irrelevant to prove the criminal conduct the state had alleged, the state argued that the evidence was admissible per Evid.R. 404(B) to prove *identity.* We addressed that issue in *Smith, supra.*

In *Smith,* the defendant was alleged to have "groped" a young boy when the boy slept over at the defendant's home. The defendant and the alleged victim were alone in the home. The boy testified that the event took place. The defendant denied that it occurred at all. The state offered "other act" evidence of the defendant's alleged prior sexual conduct with other young boys, arguing that the evidence of those other acts was admissible per Evid.R. 404(B) to prove *identity.* We rejected that claim because identity was not in issue, stating:

"Identity is in issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed the crime. In that event other act evidence tends to show the defendant's identity as the perpetrator by showing that he committed crimes of a similar methodology within a period of time reasonably near to the offense on trial, which itself would constitute probative evidence of the probability that the same person, whoever he or she may be, committed both crimes. *State v. Curry, supra; State v. Hector* (1969), 19 Ohio St.2d 167, 48 O.O.2d 199, 249 N.E.2d 912; *State v. Shedrick* (1991), 61 Ohio St.3d 331, 574 N.E.2d 1065. If the other act evidence tends to establish the identity of the accused it is competent evidence, no matter what else it may prove. *Barnett v. State* (1922), 104 Ohio St. 298, 135 N.E. 647. However, the identity of the perpetrator must be in dispute to permit use of other act evidence for this purpose.

"In this case the fact of the crimes is not open and evident, but is clearly in issue. However, if from the evidence the crimes are determined to have taken place, there is no dispute concerning the identity of the perpetrator. No person other than defendant Smith could have committed the criminal acts alleged. Because the identity of the perpetrator is not in issue from the operative facts of

the offenses alleged and demonstrated by the state's evidence, other act evidence is not admissible to prove identity." *Id.* at 666–667, 617 N.E.2d at 1173.

Here, as in *Smith*, whether the crime alleged actually occurred was not open or evident but was directly in issue. However, the identify of the perpetrator of that crime was not in issue. According to the theory of the state's case and the evidence it presented, if the alleged crime took place at all, no person other than Hawn could have committed it. Further, Hawn did not claim that another person had murdered Jack. Instead, he denied that she was murdered at all. The only genuine issue, therefore, was whether Jack was murdered or whether she committed suicide. Because the identity of the perpetrator of the state's murder alternative was not in issue, evidence of defendant Hawn's prior acts extrinsic to the operative facts of the crime alleged was not admissible per Evid.R. 404(B) to prove *identity*.

Nor does the evidence of the defendant's other acts which the state was allowed to introduce satisfy the temporal and circumstantial requirements of *Burson* and *Curry*. The crime was alleged to have occurred on February 21, 1998, and involved Hawn shooting Jack. The hair-pulling and black-eye incident and the domestic violence calls took place in mid-to-late November 1997. They form no part of the immediate background of the crime charged, but are factually and chronologically separate from the operative facts the crime is alleged to have involved. *State v. Eubank* (1979), 60 Ohio St.2d 183, 14 O.O.3d 416, 398 N.E.2d 567; *Smith, supra*. Nor are they inextricably related to it, lacking a reasonably close situational relationship and modal similarity to the operative facts of the alleged crime. *Burson, supra; Curry, supra; State v. Hector* (1969), 19 Ohio St.2d 167, 48 O.O.2d 199, 249 N.E.2d 912. Therefore, even if the *identity* of the perpetrator of the crime alleged had been in issue, the other acts which this evidence involves was inadmissible to prove it.

In cursory fashion the state also mentions *motive, intent,* and the *absence of mistake or accident* as possible justifications for admitting the other acts evidence in its case against Hawn.

During the trial, the state set forth no theory about Hawn's motive and it offered no evidence in that regard. In his closing argument, the prosecutor made it very clear that Hawn's motive was irrelevant and not in issue. Under those circumstances, introduction of the other acts evidence here may not now be justified by the state as proof of motive.

Hawn's intent and the absence of mistake or accident on his part were likewise not in issue. Hawn's defense was not that he lacked any purpose or intent to cause the death of Jack, or that he acted out of some sudden heat of passion, or that this shooting was accidental on his part. To the contrary,

Hawn's defense was that he did not shoot Jack, period. Under those circumstances, the other acts evidence the state was allowed to introduce was not admissible to prove intent or the absence of mistake or accident on Hawn's part.

This evidence of Hawn's other crimes or acts of wrongdoing, specifically the testimony of police officers concerning the November 16, 1997 domestic violence incident and that of other witnesses concerning the hair-pulling injury and black eye that Sue Jack suffered at about the same time, was wholly independent of the offense for which Hawn was on trial and was not made admissible by Evid.R. 404(B). This evidence created the very inferential pattern that Evid.R. 404 prohibits: that because Hawn had committed other crimes or acts of wrongdoing in the past, he is a person of bad character who acted in conformity with that bad character on this occasion to commit the crime alleged. *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180; *Smith, supra.* Such evidence is highly inflammatory and unfairly prejudicial to a defendant's right to due process of law and to a fair trial on the particular charges involved to which he is constitutionally guaranteed.

We are not unaware of the fact that crimes of domestic violence present unique and difficult problems, including problems of proof. The incidents involved are often unwitnessed, and they are frequently a part of a pattern of serious abuse from which the victim has been unable to extricate herself. Those same inclinations likewise make some victims unwilling to testify against an abuser. The problems of proof that that presents are only compounded when the victim is deceased. Even so, the fundamental rules of evidence and procedure that limit the power of government to convict and punish an individual cannot be stretched beyond their purpose in order to accommodate the needs that those problems of proof present. Those rules must be observed if the constitutional right to due process of law that all of us enjoy is to survive. It is the duty of this court to protect that right, even in the face of the clamor and criticism that often results from our performance of that duty. That is the duty we discharge here.

Hawn's first, second, and third assignments of error are sustained.

### Fourth Assignment of Error

"The trial court erred in permitting irrelevant and prejudicial opinion testimony violative of Evid.R. 701 thereby denying appellant Hawn his rights to due process of law and to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution."

Hawn challenges testimony by two police officers that in their opinion Hawn's crying and sobbing shortly after this shooting occurred was feigned. Deputy Patricia Cavender testified:

"Q. Again, at the end of that entire conversation, was the defendant's eyes red, swollen, anything like that?

"A. Not that I can recall. The biggest thing that struck me was that no tears came out of his eyes. He was not crying. His face was never wet that I could see.

"Q. Have you ever seen people fake crying during your life?

"MR. GREER: Objection.

"THE COURT: Overruled. You may answer.

"THE WITNESS: Yes.

"BY MR. DAIDONE:

"Q. How would you categorize the defendant's crying during your talking with him?

"MR. GREER: Objection.

"THE COURT: She may opine. Overruled. You may answer.

"THE WITNESS: It struck me as though he was not crying; it was a fake sob."

Deputy Michael Brem testified:

"Q. When you were in the family room, did you have an opportunity to view the defendant's face at this time?

"A. Yes.

"Q. Now, you indicated he was crying or sobbing. Can you explain that in a little more detail to the jury?

"A. He was—he was crying without tears. It appeared to me that it was more a fake cry because it was more, you know, he didn't have any tears. It was (indicating). It was—it didn't have redness to the eyes. No tears. For a long period of time I never saw any tears come from him."

Evid.R. 701, which governs opinion testimony by lay witnesses, provides:

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

Hawn argues that the trial court abused its discretion in admitting this lay opinion testimony because these witnesses were not qualified to express an opinion on the genuineness of his remorse. Furthermore, Hawn asserts that the jury was capable of drawing its own conclusion with respect to that issue, and

thus these opinions were not helpful in determining a fact in issue, whether Jack committed suicide as Hawn claims.

First, we note that with respect to the testimony by Dep. Michael Brem, Hawn failed to object on the grounds he now argues. Absent "plain error," the error, if any, in admitting Brem's testimony was waived by Hawn's failure to object. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364; *State v. Wickline* (1990), 50 Ohio St.3d 114, 552 N.E.2d 913. Plain error does not exist unless it can be said that but for the error the outcome of the trial *clearly* would have been otherwise. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. Any error in admitting Dep. Brem's testimony does not rise to the level of plain error.

Hawn did object to the testimony offered by Dep. Cavender. In order for Cavender's lay opinion testimony to be admissible, it must be (1) rationally based upon her perceptions and (2) helpful to an understanding of her testimony or the determination of a fact in issue. Evid.R. 701. We conclude that neither requirement has been met in this case.

Dep. Cavender's stated opinion that Hawn's crying and remorsefulness was faked was predicated solely on the fact that Cavender saw no tears in Hawn's eyes. From that, the jury was asked to infer that Hawn had killed Jack. We believe that Cavender's opinion, predicated as it was upon that single feature, is highly speculative when applied to this defendant, who might just as well have been in a state of shock as a result of just seeing his girlfriend kill herself, which was his contention.

In *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329, the witness's testimony that the murder victim "appeared scared" was rationally based upon the witness's seeing the victim literally running for his life when the defendant attacked him. However, what "struck" Dep. Cavender when she observed Hawn shortly after this shooting occurred, that Hawn had no tears in his eyes, does not rationally support Officer Cavender's highly speculative opinion that Hawn's crying and remorse were faked. Moreover, that conclusion did nothing to help the jury understand Dep. Cavender's other testimony. It was simply an opinion offered on the genuineness of Hawn's feelings in order to rebut the veracity of his claim that Jack had committed suicide. The slight probative value of this testimony was substantially outweighed by its highly speculative nature and the danger of unfair prejudice. Evid.R. 403(A). The trial court abused its discretion in admitting this lay opinion testimony over Hawn's objection.

Hawn's fourth assignment of error is sustained, in part.

### Fifth Assignment of Error

"The trial court's erroneous evidentiary rulings deprived appellant Hawn of his rights against self–incrimination as guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution."

Hawn argues that the trial court's erroneous evidentiary rulings that improperly allowed testimony to be presented to the jury concerning the disingenuousness of his remorse and his previous other crimes, wrongs, or acts of domestic violence deprived Hawn of his constitutional right to remain silent and not incriminate himself because they forced Hawn to testify at trial in order to rebut the inferences that this inadmissible evidence created: that Hawn killed Jack because he had been abusive and at times physically violent toward her.

In support of his contention, Hawn relies upon *Harrison v. United States* (1968), 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047. In that case, during defendant's jury trial for murder defense counsel indicated in his opening statements that defendant would not take the stand and testify. After the state introduced defendant's confessions to police during its case-in-chief, defendant took the witness stand and gave his version of the events. Defendant was found guilty, but on appeal his conviction was reversed on a finding that his confessions had been illegally obtained by police and were therefore not admissible in evidence against him.

Upon remand, *Harrison* was again tried before a jury. While the prosecutor during the second trial did not offer evidence of defendant's illegally obtained confessions, he did nevertheless read to the jury defendant's testimony from the first trial. Defense counsel objected, stating that defendant's testimony at the first trial had been improperly compelled by the introduction into evidence of defendant's inadmissible confessions. Defendant was once again convicted and the court of appeals affirmed.

The United States Supreme Court reversed defendant's conviction, holding that because defendant had testified at the first trial only after the government introduced evidence of his confessions, which were illegally obtained, defendant's trial testimony was tainted by the same illegality that rendered his confessions inadmissible. Thus, the fruit of the poisonous tree doctrine barred the use of defendant's testimony from his first trial in the subsequent trial.

We do not believe that the case before us is controlled by the decision in *Harrison*. First of all it is not clear in this case whether Hawn had made a decision to testify at trial in order to put his version of these events before the jury prior to the presentation of the state's improper evidence. Furthermore, the case before us does not involve any retrial or subsequent proceeding. Even more

critical, we believe, is the fact that the inadmissible evidence improperly admitted during Hawn's trial involved, for the most part, his other crimes and acts of wrongdoing involving domestic violence matters, collateral matters which were too remote in time and circumstance to have any relevance to Hawn's guilt for shooting Jack, much less identify him as the perpetrator of that crime.

Unlike *Harrison*, the improperly admitted evidence here did not involve defendant's own statements to police that were improperly obtained, a constitutional violation of Fifth Amendment rights which would require suppression. Thus, we cannot say that the form of error and the fundamental illegality at issue in the case before us are the same as in *Harrison*. In Hawn's case there is no Fifth Amendment self-incrimination consideration involved in the evidence that was improperly admitted, and Hawn's testimony at trial, while perhaps strategically desirable or necessary to lessen or overcome the impact of that improperly admitted evidence, was nevertheless not *compelled* in the constitutional sense or otherwise derived from the illegality of the improperly admitted evidence.

Hawn's fifth assignment of error is not well taken and is overruled.

### Sixth Assignment of Error

"The trial court erred in permitting improper rebuttal testimony which violated Mr. Hawn's constitutional rights to a fair trial."

Hawn argues that the rebuttal testimony of the state's firearms experts, David Brundage, was improper because it was cumulative to the state's evidence-in-chief and was offered merely to bolster the testimony previously given by the state's other firearms expert, Chris Monturo, during the state's case-in-chief.

During the state's case-in-chief, Chris Monturo, a firearms expert, opined that the gun which killed Sue Jack was fired from a distance of over five feet away. This testimony rebuts Hawn's claim that Jack had committed suicide and constitutes the primary evidence upon which the state relied to prove that Hawn murdered Jack.

Monturo's opinion was based upon the fact that when a gun is fired, various debris comes out of the end of the gun barrel behind the bullet: gas pressure, heat/flame, burned/unburned gunpowder residue, smoke, soot, and lead. Test shots conducted in this case demonstrate that as this gun is fired from a distance closer and closer to its target, more and more of these debris materials are deposited on that target.

An examination of Jack's clothing and the area around her entrance wound failed to reveal gunshot residue deposits in the amounts one would expect had Jack been shot at very close range. Monturo testified that one cannot determine how far a gun was away from its target when fired simply by the size of the bullet

hole. Rather, it is necessary to look at the characteristics of that hole and the gunshot residue deposits.

In support of his defense theory that Jack committed suicide, Hawn presented two firearms experts, Dr. Martin Fackler and Carl Haemmerle. These experts contradicted the state's expert, Chris Monturo, and opined that Jack was shot at very close range, a contact shot or less than two inches away. The opinions of Fackler and Haemmerle were based primarily upon the size of the bullet hole in Jack's clothing and the fact that test firings conducted with the gun demonstrate that the only way it would have produced a hole the size of the one observed in Jack's clothing is from a shot fired from less than two inches away. Dr. Fackler also noted the presence of some gunshot residue on Jack's clothing, some "stippling" around her entrance wound, and some sooting near that stippling.

On rebuttal the state offered testimony by another firearms expert, David Brundage. Hawn objected to any testimony by Brundage relating to gunshot residue deposits, claiming that such testimony would only be cumulative to the evidence already introduced during the state's case-in-chief through Chris Monturo and therefore not proper rebuttal. The trial court ruled that Brundage would be permitted to give his opinion on the validity of using bullet hole sizes to determine how far the gun was away when fired because that is what the defense firearms experts testified about. The trial court also ruled, however, that Brundage could not testify concerning any conclusions he formed after testing Jack's clothing in relation to gunshot residue deposits because that evidence could have been presented during the state's case-in-chief.

When the prosecutor asked Brundage on rebuttal what testing procedures he used to determine muzzle-to-garment distances for gunshots, Hawn objected that this line of inquiry was leading toward gunshot-residue evidence and a rehashing of the evidence the state presented during its case-in-chief. The trial court sustained Hawn's objection.

Brundage then testified that it is improper and misleading to use bullet-hole sizes to determine how far this gun was away from Jack when fired. According to Brundage, the proper protocol for making such a determination requires consideration of the deposits or lack of deposits of gunshot-residue materials that come out of the end of the barrel when the gun is fired. Hawn objected to Brundage's explaining what these various materials are that come out of the gun barrel behind the bullet, but the trial court overruled Hawn's objection.

At that point, Brundage produced and identified State's Exhibit 69, a high-speed photograph depicting a gun being fired, but not the gun used to kill Jack. Brundage used this photograph, not previously disclosed to the defense, as demonstrative evidence to illustrate in very dramatic fashion the various materials that come out of the barrel of a gun when it is fired: fire, a cloud of smoke

and soot, and particles of gunpowder. Brundage testified that the deposit made by these gunshot residue materials should be the focus of a forensic examination. After Brundage finished explaining to the jury what the photograph depicts, Hawn objected, whereupon the court barred any further testimony "beyond the scope of rebuttal."

Generally, evidence which does not contradict or refute evidence presented by the opposing party but rather is merely cumulative to evidence presented during the case-in-chief is not proper rebuttal evidence. *State v. Wood* (June 21, 1996), Portage App. No. 95-P-0009, unreported, 1996 WL 649132. Where, however, testimony by a rebuttal witness for the state contradicts the defense, the mere fact that the testimony also bolsters the state's case-in-chief does not render it inappropriate. *State v. Owens* (Nov. 30, 1994), Montgomery App. No. 14068, unreported, 1994 WL 683395.

The state argues that in the course of explaining why it is not proper protocol for firearms examiners to utilize bullet-hole size alone to determine how far a gun is away when fired, as the defense experts did in this case, it was necessary for Brundage to some extent to touch upon gunshot residue in his rebuttal testimony. While that may be true, we conclude that the substantial extent to which Brundage commented upon gunshot residue during his testimony clearly crossed over the line of proper rebuttal.

The high-speed photograph that Brundage used dramatically depicts the large amounts of residue materials that are spewed from out of its barrel when a gun is fired. The photograph creates an inference that amounts of this residue may be deposited on articles at various distances from the gun barrel when a gun is fired. The prosecutor's comment upon this photograph in his closing argument, and Brundage's testimony that it is these gunshot residue deposits that one should look for on an article, clearly crossed the line of proper rebuttal testimony and became a mere rehashing of evidence already presented during the state's case-in-chief. The purpose was to bolster the testimony previously given by Chris Monturo. Indeed, Brundage's rebuttal testimony runs more to gunshot residue deposits than it does to bullet-hole sizes. This was not proper rebuttal testimony and the trial court abused its discretion in admitting it.

Hawn's sixth assignment of error is well taken and is hereby sustained.

### Seventh Assignment of Error

"The trial court erred by overruling appellant Hawn's Criminal Rule 29 motions for acquittal thereby denying Mr. Hawn his rights as guaranteed to him by the Fifth and Fourteenth Amendments to the United States Constitution and Article I of the Ohio Constitution."

At the close of the state's case, at the close of all the evidence, and again in a post-verdict motion, Hawn moved for acquittal pursuant to Crim.R. 29. The trial court overruled each of these motions. Hawn now argues that the trial court erred in not granting his motions for acquittal because the evidence presented was insufficient to convict him of purposely causing the death of Jack in violation of R.C. 2903.02.

When considering a Crim.R. 29 motion for acquittal, the trial court must construe the evidence in a light most favorable to the state and determine whether reasonable minds could reach different conclusions on whether the evidence proves each element of the offense charged beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184. The motion will be granted only if reasonable minds could only conclude that the evidence fails to prove all of the elements of the crime. *State v. Miley* (1996), 114 Ohio App.3d 738, 684 N.E.2d 102.

" 'Sufficiency' of the evidence refers to its logical capacity to demonstrate both the criminal conduct and the culpable mental state that the alleged criminal liability requires. The test is whether all or some part of the evidence that was admitted in the trial would, if believed, convince the average mind beyond a reasonable doubt that the defendant is guilty of committing the offense charged. *State v. Jenks* (1991), 61 Ohio St.3d 259 [574 N.E.2d 492], paragraph two of the syllabus. 'Weight' of the evidence refers to the inclination of the greater amount of the credible evidence presented in a trial to prove the issue established by the verdict that was reached. *State v. Thompkins* (1997), 78 Ohio St.3d 380 [678 N.E.2d 541]. The test is whether that evidence is capable of inducing belief in its truth, and whether those truths preponderate in favor of the verdict according to the applicable burden of proof. *Id.*" *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97–CA–03, unreported, at 7, 1997 WL 691510.

A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. *Thompkins, supra.* The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

The evidence presented by the state in this case, if accepted as true, demonstrates that only Hawn and Jack were present at the time of this shooting. Hawn claimed that Jack committed suicide. Hawn gave differing versions of what happened to various people at different times. Neither Jack's nor Hawn's fingerprints were found on the gun. There was no gunshot residue found on either Jack's or Hawn's hands. Hawn did have blood all over his hands and clothing, whereas Jack did not. The forensic pathologist who performed the autopsy on Jack did not find gunpowder residue on Jack's body or clothing near the entrance wound, or inside the wound track itself, which would indicate a close range or contact shot. Based upon his tests of this gun and his examination of Jack's clothing, the state's firearms expert opined that this gun was at least five feet away when it was fired into Jack's chest.

Viewing this evidence in a light most favorable to the state, as we must for purposes of a Crim.R. 29 motion, we conclude that a rational trier of fact could find all of the essential elements of murder proven beyond a reasonable doubt. Hawn's conviction is supported by legally sufficient evidence and the trial court properly overruled Hawn's Crim.R. 29 motions for acquittal.

Hawn's seventh assignment of error is not well taken and is overruled.

### Eighth Assignment of Error

"The manifest weight of the evidence does not support appellant Hawn's conviction for purposeful murder with a firearm specification in violation of his constitutional rights."

### Ninth Assignment of Error

"The cumulative effect of numerous errors occurring during the proceedings resulted in a fundamentally unfair trial."

In view of our disposition of Hawn's previous assignments of error, we conclude that these assignments of error are rendered moot. Accordingly, pursuant to App.R. 12(A)(1)(c), we decline to determine them.

Having sustained Hawn's first, second, third, fourth, and sixth assignments of error, the judgment of the trial court will be reversed, and this case is remanded for a new trial consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BROGAN and FAIN, JJ., concur.