[Cite as *State v. Williams*, 2015-Ohio-5494.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26645 |
| | : | |
| v. | : | T.C. NO. 14CRB7317 |
| | : | |
| CAROLYN WILLIAMS | : | (Criminal appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 30th day of December, 2015.

. . . . . . . . . . .

TROY B. DANIELS, Atty, Reg. No. 0084957, Assistant City Prosecutor, 335 W. Third Street, Rm. 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

P. J. CONBOY II, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Carolyn Williams, filed April 7, 2015. Williams appeals from her March 6, 2015 Judgment Entry of Conviction, issued after a bench trial in Dayton Municipal Court, on one count of

trespassing, in violation of R.C. 2911.21(A)(3), a misdemeanor of the fourth degree, and three counts of menacing, in violation of R.C. 2903.22, misdemeanors of the fourth degree. Williams received concurrent sentences of 30 days for each of the menacing offenses, and thirty days for the trespassing offense, to be served consecutively to the sentences for menacing, all of which the court suspended. The court placed Williams on community control sanctions for one year and ordered her to complete a psychological assessment through the probation department and any recommended treatment, and to complete an anger management class. We hereby affirm the judgment of the municipal court.

{¶ 2} Williams was charged by way of criminal complaint on September 30, 2014, and she pled not guilty on October 10, 2014. At Williams' March 5, 2015 trial, Francesca Evans testified that she resides at 1519 Canfield Avenue with her mother, Joanne Evans Stummer, and that Williams is her next door neighbor, residing at 1523 Canfield Avenue. Evans identified a photograph of her home and Williams' home, and she testified that their driveways are right next to each other. Evans identified her concrete driveway and stated that a portion of Williams' black topped driveway is her property, because "last year when section eight came out and the owner had to fix the blacktop, I wasn't home and she blacktopped on some of my property." According to Evans, on the morning of September 27, 2014 she "got up and I am inside my home. I pushed the button for the coffeemaker. I am ready to pull the curtains back and there's Miss Williams and she's shooting motor oil and (sic) one hand and lighter fluid in the other, you can read it plain as day, so I ran and grabbed the cordless" to call 911. Evans stated that Williams was outside her kitchen window at the back of Evans' home, standing in a flower bed. Evans

stated she banged on her window and that Williams "took off running," carrying the motor oil and lighter fluid. Evans testified that Williams ran to the detached garage behind Williams' home and sprayed the motor oil and lighter fluid along the side of her garage. According to Evans, Williams then ran to her truck, which was parked in Williams' driveway, and drove away.

**{¶ 3}** Evans testified that she had previously contacted the police, on September 22, 2014, about a trespassing issue with Williams, and that the police responded and advised her that they would tell Williams that she was not allowed to be on Evans' property. Evans testified that when the police responded on September 27, 2014, she advised them of Williams' conduct and "showed them the flowerbed behind my window where the motor oil and lighter fluid was running down the brick and all in the flowerbed." Evans stated that the officers touched and smelled the liquid on the flowers. Evans stated that the officers took her report and departed before Williams returned.

**{¶ 4}** Evans stated that when Williams later returned home, Evans, Stummer, and neighbor Cynthia Jackson were standing in Evans' attached garage with the door open. The following exchange occurred regarding Williams' arrival:

> Q. Okay and then what happens once she pulls in?
>
> A. * * * We were just in there talking and we came out because Miss
>
> Jackson is going home and she jumped out of the back of her truck[.]
>
> Q. Who jumped out of the back of the truck?
>
> A. Miss Williams.
>
> Q. Okay.
>
> A. And she had a shovel in her hand and excuse me but she said,

"I will fuck you up and your mother."

Q. And when she said that what did you think she might do?

A. Swing the shovel and hit us.

Q. Alright and did you think that that would cause you or your mother harm?

A. Yes.

Q. What happened then?

A. I called the police again.

Q. Okay, do you still have your wireless with you, your cordless?

A. Yes * * *.

Q. And what did Miss Williams do?

A. She took off running.

Q. And where did she run too?

A. To her truck and speeded off.

* * *

Q. Did the police return?

A. Yes.

Evans stated that she provided the additional information to the police.

{¶ 5} On cross-examination, Evans stated Williams rents her home and that she and the owner of Williams' home have discussed the location of the property line between the homes. Evans stated that her mother owns their home at 1519 Canfield. When asked to repeat Williams' exact words upon her return to her home, Evans testified that Williams said, " 'I'm going to fuck you up and your momma and your neighbor.' "

{¶ 6} Joanna Stummer testified that on the morning of September 27, 2014, she returned home to the Canfield Avenue home she shares with Evans and learned that Williams had come over and "was pouring something on the flowers." She stated that after calling the police, she and Evans went around the house to look at the flowers at the back of their home, and that there was "a lot of moisture, something wet all on behind the flowers. It had a smell." Stummer stated that it was "oil, gasoline or kerosene, definitely some kind of oil and it was greasy and nasty smelling." Stummer stated that she touched the substance and that it felt greasy. According to Stummer, when the officers arrived, one of them also touched the substance and "rubbed it in their fingers." Stummer stated that she was in the garage of her home when Williams returned, and that Williams "made some remarks about what she would do to us." According to Stummer, Williams "always had that darn shovel. She had that shovel in the back of the truck and then she wants to swing that shovel and cuss and carry-on. She does that all the time. It's nothing new. She did have that shovel." Stummer testified that Williams "said that she would fuck us up." The following exchange occurred:

> Q. What did you believe based on her telling you that? Did you think she might harm you?
>
> A. That's a form of harassment as far as I'm concerned and that's a threat to what she would do to somebody. That's a threat.
>
> Q. Did you think she might actually carry it out?
>
> A. Sure, I think she would do it. She acts wacky. Yes, she would do it. You don't be waiving stuff at people like that and saying things like

that to people.   That's not right.

Q.   And did you think that if she hit you with the shovel, that it might cause you some sort of problem?

A.   Why sure it would.   You hit somebody with a shovel.   You know that it's going to do them some harm; whatever, a fork or a shovel or whatever.   You know that it's going to do them some harm.

Q.   And you thought she might do that to you?

A.   I certainly did sir.

{¶ 7}   Cynthia Jackson testified that she resides at 1531 Canfield Avenue, two houses away from Evans and Stummer, and that she visits their home every day. Jackson stated that on September 27, 2014, she went to visit Evans, who was upset when she arrived about an encounter with Williams. Jackson stated that the police arrived two or three minutes after she did, and that she smelled gas behind Evans' home.   She stated that she observed the police inspect the flowers behind Evans' home.   The following exchange occurred:

Q.   * * * What happened when Miss Williams came back?

A.   She said some smart remark that she was going to get my mama and my kids.   I told her I would fuck her ass up.

Q. Okay, so she arrives in the truck?

A. Ah-huh.

* * *

Q.   Okay and did she have anything with her?   Was she empty handed or did she have something in her hands?

A.   I can't remember.

* * *

Q.   Alright, when she told you that she would fuck up your momma and your kids, did you think that she might be serious?

A.   Hell yeah.

Q.   Alright, and when you felt that, did you think that she might cause them some sort of harm?

A.   Yes.

Jackson stated that she responded as she did to Williams because she believed Willimas would carry out her threat.

{¶ 8} At the conclusion of Jackson's testimony, counsel for Williams stipulated to the testimony of the State's next witness, Officer Britney Brown, who intended to testify that on September 22, 2014, she told Williams that she was not permitted to go onto the property of Evans and Stummer.   Counsel for Jackson then moved for an acquittal of the menacing charge relating to Jackson on the basis that her testimony was inconsistent with that of Evans and Stummer.   Counsel for Williams asserted that Jackson merely testified that she and Williams cursed at each other in a "tit for tat" manner, and that the State accordingly failed to meet its burden of proof. The court overruled the motion.

{¶ 9} Williams testified that she has resided at 1523 Canfield Avenue since April of 2014.   She stated that on the date of the incident, she sprayed bug spray around the area of her garage.   The following exchange occurred:

Q.   What were the bugs that you were spraying?

A.   It was big old crickets.

Q.   Okay, alright and what was your intention in spraying?

A.   To get them crickets; kill them crickets.

Q.   Did you at any time spray at * * * 1519 Canfield?

A.   Never.

Q.   You sprayed where?

A.   At my garage.

Q. * * * Did you ever have motor oil?

A.   No.

Q.   Did you ever have lighter fluid?

A.   No.

A.   * * *Did you * * *have any discussion with her, Francesca after you sprayed?

A.   No.

Q.   Okay, then what did you do after you sprayed?

A.   I left.

Q.   Okay and did you come back?

A.   Yes, I cut some more hair.

Q.   Okay, when you came back, what did you do?   What did you say?   What happened?

* * *

A.   I never said anything to those ladies.   I was in my truck getting

ready to leave and Cynthia told those two kids; a fourteen year old and twelve year old. She told them little kids she was going down to her house. She said, "You all, get her, get her."

Q. And what did you say?

A. I told you all better get back up there because I would have "F" 'ed them up.

Q. Okay, alright.

A. Jump me.

**{¶ 10}** On cross-examination, when asked about the type of bug spray she used, Williams stated that she "had stopped at the Lowe's and bought me some bug spray." Williams stated that she was never near Evans' rear kitchen window, and that she never heard Evans bang on the window. The following exchange occurred:

Q. And, what about a shovel? Do you keep a shovel in the back of your truck?

A. No, I don't.

Q. And you never had a shovel on this day?

A. I had a shovel Saturday morning early and I took it back across the street to Miss Ernestine because she let me use her shovel digging weeds.

Q. So this was Saturday morning?

A. It was Saturday morning.

Q. So you did have a shovel Saturday morning?

A. I took a shovel back to Miss Ernestine Sutton; she lives right

across the street. She let me borrow her shovel that day to shovel up some weeds and stuff because I do like to work in my yard.

Q. Okay, so you're saying you got a shovel, it just wasn't' your shovel?

A. No, it was not my shovel.

Q. Okay and you had the shovel in your hand when you're telling; you said you told those kids that you'd fuck them up?

A. I did not have no shovel in my hand. I took it over to Miss Ernestine early that morning cause I have appointments to go into the nursing home and cut hair. I had came back home and Cynthia, she told them kids, "You all, get her, get her." She got a fourteen year old and a twelve year old grandkids. I was acting in my own defense because they always whipped Cindy and I was not going to let no kid jump me.

Q. And you told the kids you were going to fuck them up?

A. I would have, yes sir.

Q. But you never said that to other people?

A. No.

{¶ 11} Williams asserts two assignments of error herein. Her first assigned error is as follows:

THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF CRIMINAL TRESPASS AS SUCH CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶ 12}** As this Court has previously noted:

When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Consequently, a judgment should be reversed as being against the manifest

weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

*State v. Griffith*, 2d Dist. Montgomery No 26451, 2015-Ohio-4112, ¶ 26-28.

{¶ 13} R.C. 2911.21provides: "(A) No person, without privilege to do so, shall do any of the following: * * * (3) Recklessy enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender * * *." "A person acts recklessly when, with heedless

indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. * * * ."  R.C. 2901.22(C).

{¶ 14} Counsel for Williams stipulated to the fact that Officer Brown advised Williams that she was not permitted to enter onto the 1519 Canfield Avenue property. While Evans acknowledged that the property line between her home and Williams' home is in dispute, her testimony was clear that she observed Williams immediately outside her rear kitchen window, in the flowerbed beneath the window.  Although Williams denied being on the property, the trial court observed both Evans and Williams testify and credited Evans' testimony over that of Williams, and we defer to the trial court's assessment of credibility. Having reviewed the entire record and considered the evidence, we cannot conclude that the trial court lost its way and created a manifest injustice in convicting Williams of criminal trespass.   In other words, Williams' conviction for criminal trespass is not against the manifest weight of the evidence.   Further, after viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the elements of criminal trespass proven beyond a reasonable doubt, and we accordingly conclude that Williams' conviction is supported by sufficient evidence. For the foregoing reasons, Williams' first assignment of error is overruled.

{¶ 15} Williams' second assignment of error is as follows:

THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF MENACING AS SUCH CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶ 16}** R.C. 2903.22 proscribes menacing and provides: "(A) No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person, * * * or a member of the other person's immediate family." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. * * *." R.C. 2901.22(B).

**{¶ 17}** Evans testified that Williams verbally threatened her and her mother with a shovel in her hand, and that she thought Williams would "swing the shovel and hit us," causing them harm. Stummer also testified that Williams verbally threatened her and waived the shovel, and that she thought Williams would carry out the threat, resulting in harm. Finally, Jackson testified that Williams told her that "she going to get my mama and my kids," that she believed that Williams was serious, and that she responded the way that she did because she feared harm from Williams. While Evans' testimony and Jackson's were slightly inconsistent regarding whom Williams threatened, all three women testified that they felt threatened by Williams' language and conduct. Although Williams denied menacing the women, the trial court discredited her testimony, and as the court was in the best position to evaluate the credibility of all of the witnesses, we defer to the trial court's assessment of credibility. Having reviewed the entire record and considered all the evidence, we cannot conclude that the trial court lost its way and created a manifest injustice in convicting Williams of three counts of menacing. Further, construing the evidence in a light most favorable to the State, we conclude that a rational

fact finder could have found the elements of menacing proven beyond a reasonable doubt. Accordingly, Williams' second assignment of error is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Troy B. Daniels
P. J. Conboy II
Hon. John S. Pickrel