[Cite as *State v. Soueidi*, 2011-Ohio-3580.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 95366

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## HIAM SOUEIDI

DEFENDANT-APPELLANT

---

## JUDGMENT:
## REVERSED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-529201

**BEFORE:** Keough, J., Sweeney, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** July 21, 2011

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Chief Public Defender

BY:  Cullen Sweeney
Assistant Public Defender
310 Lakeside Avenue
Suite 400
Cleveland, OH 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY:  James D. May
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

KATHLEEN ANN KEOUGH, J.:

**{¶ 1}** Defendant-appellant, Hiam Soueidi ("Hiam"), appeals her convictions for theft by deception and securing writings by deception. For the reasons that follow, we reverse and vacate her convictions.

**{¶ 2}** In October 2009, Hiam was charged with theft by deception pursuant to R.C. 2913.02(A)(3) and securing writings by deception pursuant

to R.C. 2913.43(A), each containing a furthermore specification that the value of the property involved was more than $25,000 but less than $1,000,000 and that the victim was disabled. The matter proceeded before a jury where the following evidence was presented.

{¶ 3} Georges and Hiam Soueidi were married in 1985, had three daughters, and resided in Utah. In 1999, Georges and Hiam were involved in a terrible automobile accident where Georges suffered significant head trauma that left him in a coma for six months. When he came out of the coma, it was revealed that Georges had suffered substantial, permanent brain damage. Following the accident, Hiam quit her job to care for Georges. She was also appointed conservator over him, and was responsible for his personal and financial affairs. Because of his injury, Georges's personality changed and he became verbally and physically abusive to Hiam and their daughters. In 2007, Hiam separated from Georges and filed for divorce. When Hiam filed for divorce, Georges moved to Cuyahoga County to be closer to his siblings.

{¶ 4} In December 2007, Bachara and Lina Soueidi, Georges's brother and sister-in-law, petitioned a Utah court to accept the resignation of Hiam as conservator and appoint them successor co-conservators over Georges. The court granted their petition in January 2008.

**{¶ 5}** The trial testimony established that Georges lives independently in an apartment in Strongsville. He signed the lease to his apartment without the help of his co-conservators, but with the assistance of his other brother, Nemr Soueidi. Georges is able to walk freely and independently to local stores and establishments. According to Georges, he has friends in the apartment complex, including his friend "Fred." Georges has obtained his own cell phone and opened his own credit card and checking accounts, without the assistance or knowledge of his co-conservators.

**{¶ 6}** The testimony established that Georges receives $1,768 in disability benefits from an insurance policy through his former employer, which is enough for him to live on. When his check arrives, Georges signs and Bachara cashes it to pay for Georges's rent and medications. Lina testified that if Georges does not take his medications, he can get "mean." He has difficulty regulating his emotions and can easily become upset or very emotional and even volatile under certain conditions. Georges has screamed at Lina and even threatened her in the past. Additionally, Georges filed a police report accusing Lina and Bachara of "taking his money and jewelry."

**{¶ 7}** Georges and Hiam's divorce was finalized by a Utah court in March 2009. Hiam was awarded sole physical custody of their minor daughter, age 14. Georges was not ordered to pay monthly child support; Hiam was solely responsible for providing for their three children. As part of

the divorce decree, Hiam was awarded exclusive use and possession of the Midvale town home, located in Utah, until their minor daughter graduated from high school; the divorce decree provided that "reasonable efforts will be made to sell the property in a timely fashion." The divorce decree further provided that when the town home is sold, Hiam is to receive 62 percent of the proceeds from the sale and Georges is to receive the remaining 38 percent. Until the house was sold, Hiam was entitled to "additionally encumber the [Midvale town home] up to her interest in the property." According to both Hiam and Georges, the Midvale town home is valued at $300,000.

{¶ 8} By the time the divorce was finalized, Hiam needed a loan to pay her legal fees, other bills, and the children's medical bills and educational costs. Sometime between the finalization of the divorce and June 2009, she contacted a Utah title company, Inwest Title Services, Inc. ("Inwest"), and inquired about taking an additional mortgage on the Midvale town home to help with these debts. According to Hiam, Inwest informed her that she could not receive an additional mortgage on the Midvale town home unless Georges also agreed to the loan because of his share in the house. Hiam testified that Inwest advised her that Georges had a lien on the property. Hiam testified that she gave Inwest Georges's contact information, which included his cell phone number and address, and that Inwest handled the entire transaction. Hiam did not give Inwest Lina's or Bachara's contact

information, or advise Inwest that Georges was under a conservatorship. To facilitate the loan, Inwest drafted all necessary documents for Georges to sign, including a Special Warranty Deed ("Deed") and an "Instruction Letter and Hold Harmless Agreement." Hiam did not create these documents nor did she receive a copy of them. No one from Inwest testified at trial.

{¶ 9} Around the time Hiam was trying to obtain the loan, Lina and Bachara had a month-long trip scheduled to Lebanon for a family wedding. Although they purchased a plane ticket for Georges, he decided not to travel to Lebanon, but stay home under the supervision of his brother Nemr. Lina testified that she had no concerns leaving Georges for the month. Lina left on June 24th and Bachara left on July 1st. According to Hiam, while Lina and Bachara were in Lebanon, Georges called her and said he needed help because his brother and sister-in-law had gone to Lebanon and he had no money. Hiam testified that she told their eldest daughter, Maya Soueidi ("Maya"), to fly to Ohio to help her father because she was concerned about his living conditions.

{¶ 10} In June 2009, Inwest contacted Titleco Title Agency ("Titleco") in Middleburg Heights, Ohio to notarize Georges's signature on the Deed. Kim Beth Greco ("Greco"), owner of Titleco and a notary public, testified that she notarized Georges's signature on two different documents on two different days.

{¶ 11} On June 26, 2009, Georges and another "gentleman," (later identified as Fred), came to her office. At this meeting, Georges signed the Deed conveying his interest in the Midvale town home to Hiam. According to Greco, a special warranty deed is a deed that conveys title to property; it is "how you give something away that you own."

{¶ 12} The Deed provided in bold upper case letters: "THIS SPECIAL WARRANTY DEED IS GIVEN AS FULL SATISFACTION OF ANY EQUITY LIEN SET FORTH IN THE TERMS OF THAT CERTAIN DECREE OF DIVORCE FILED JUNE 3, 2009, AS CASE NO. 074905498, FILED IN THE THIRD DISTRICT COURT, WHEREIN HIAM SOUEIDI APPEARS AS PETITIONER AND GEORGES M. SOUEIDI APPEARS AS RESPONDENT." Greco testified that she could not recall if Georges brought the deed with him or if she received it from Inwest directly. According to Greco, when Georges and Fred came to the office, Georges began showing her pictures of his family. She testified that as they were talking about the document, Georges "got a little — him and the other gentleman had a conversation. Unfortunately I don't know what it was and — it was in a different language — Georges got upset and Georges left. They left after they signed." Greco testified that Georges initially spoke English but "then as he got a little agitated it was a different language," which she found to be a "little strange." She also described Georges as "elderly" based on his motions and how he

walked and talked with her. According to Greco, the entire appointment lasted 45 minutes. Greco then sent the Deed to Inwest.

{¶ 13} Two weeks later, on July 10th, Georges came back to the title office with his daughter Maya to sign a second document. This document, dated July 9, was in reference to "Hiam Soueidi, Payoff of Decree of Divorce Instruction Letter and Hold Harmless Agreement." The document purported to be a letter to Vicky Robbins of Inwest from Georges (1) instructing Inwest to record the previously executed deed, (2) acknowledging that he would receive a check for $10,000 if and when Hiam's refinancing was completed, and (3) holding Inwest harmless. The testimony established that Georges did not draft this letter; in fact, Greco testified that she received this letter via email from Inwest Title and there was no suggestion that Georges drafted or could have drafted the letter. According to Greco, Maya and Georges spoke in a foreign language to each other and their conversation was "elevated." After Georges signed and Greco notarized the letter, Maya and Georges left. The entire meeting lasted five to ten minutes. Greco then sent the document to Inwest as instructed.

{¶ 14} Georges, who was deemed competent to testify at trial, testified that a man came to his apartment requesting that he sign a "paper." Fred read the paper and told him not to sign the "paper" because it was from his wife. Georges asked the man for his address and told him that maybe he

would call him.  Georges then testified:  "[A]nd after maybe five minutes, my wife she call me:  Why you never call?  Sign the paper.  I tell her: Okay, I want to sign, sign.  But you must tell Fred the address.  She talk with Fred the address.  And she talk with Fred.  You give them address.  She give them address, I go me and Fred to the woman and I sign.  I give her the paper for me, drive license Utah."

{¶ 15} Georges also testified about signing a document when his daughter Maya came to visit.  "And after Maya, when she come also, they call me from Utah, a man.  And they tell me: You must go sign the paper.  I tell him, I don't understand English and he tell me wait, maybe I bring a woman to speak with you Arabic.  I tell him, yes.  She come, a woman.  She speak Egyptian.  I understand, you know.  I am Lebanese.  I understand Egyptian, Saudi.  She come; blah, blah, blah, blah.  She come, start talk, talk, talk, and I start talk with her in English.   I tell her: I am disabled, what you want from me?  You want me to sign or not — no, she tell me, no, you must sign.  Okay.  I sign.  I sign.  Maya, she take me.  And I sign."

{¶ 16} After Georges signed the documents, Hiam eventually received a loan for $150,000 and Georges received a $10,000 check dated July 28, 2009 issued by Inwest, with the notation "satisfy divorce decree" in the "memo" area of the check.  According to Hiam, it took her three months to obtain the loan.

{¶ 17} Hiam, who is neither an attorney nor works in real estate, testified that she believed the divorce decree was still in effect and that the $10,000 was an advance on Georges's 38 percent interest in the sale of the Midvale town home. She stated that Inwest also advised her that the $10,000 was a part of Georges's 38 percent interst. Hiam testified that she intends to comply with the divorce decree when she sells the house. Hiam also testified that she did not prepare any of the documents that Georges signed, nor did she receive copies of those documents. She stated that she needed a loan, she contacted a title company, and "they did their job."

{¶ 18} When Lina and Bachara returned from Lebanon, Georges showed them the $10,000 check and they immediately took Georges to the Strongsville Police Department where they made a report and criminal charges were subsequently filed against Hiam and Maya.

{¶ 19} The jury found Hiam guilty of all charges, including the furthermore specification on each count. The trial judge sentenced her to four years in prison, but told the parties he would "favorably consider" a motion for judicial release after she served six months in prison. Hiam was remanded to the Cuyahoga County jail for seven days. Her prison sentence was stayed pending appeal.

{¶ 20} Hiam appeals, raising seven assignments of error challenging her convictions and the admissibility of testimony and evidence submitted at trial.

{¶ 21} In her first assignment of error, she contends that insufficient evidence existed to support her conviction for theft by deception and securing writings by deception, specifically arguing that the evidence was insufficient to prove the mens rea and deception elements of the offenses.

{¶ 22} When a defendant challenges the sufficiency of the evidence, she is arguing that the State presented inadequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Hawn* (2000), 138 Ohio App.3d 449, 471, 741 N.E.2d 594. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, Cuyahoga App. No. 92266, 2009-Ohio-3598, ¶12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 942, paragraph two of the syllabus.

{¶ 23} R.C. 2913.02(A)(3), regarding theft by deception, provides, in pertinent part that, "[n]o person, with purpose to deprive the owner of

property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception[.]"

**{¶ 24}** R.C. 2913.43(A), regarding securing writings by deception, provides that "no person, by deception, shall cause another to execute any writing that disposes of or encumbers property, or by which a pecuniary obligation is incurred."

**{¶ 25}** For both of these offenses, the culpable mental state is "knowingly," which is defined that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). See *State v. Wells*, Cuyahoga App. No. 92130, 2009-Ohio-4712, ¶39-41.

**{¶ 26}** The issue before this court is whether sufficient evidence was presented to establish that Hiam was aware that her conduct of refinancing the Midvale town home would probably cause Georges to lose his interest in the subject property, or whether she was aware that her conduct of telling Georges to sign the necessary documents for the refinancing would probably cause Georges to lose his interest in the subject property.

**{¶ 27}** No testimony was given by Georges that he (1) did not intend to transfer his interest in the property to Hiam, (2) did not understand the

documents he signed, (3) he would not have signed them had he understood them, or (4) was pressured, forced, or deceived into signing them. In fact, State's exhibit 10 was a signed letter dated June 24, 2009, from Georges to Vicky Robbins at Inwest, wherein he states that it was his intent to execute the Deed releasing his interest to the property.

{¶ 28} What is most troubling in this case is that no one from Inwest testified at trial. No one testified that Hiam's intent and purpose in refinancing the property was to extinguish Georges's interest in the property or that she knew the legal ramifications of refinancing the property. The only testimony presented evidencing Hiam's intent came from Hiam herself, wherein she stated that she believed the divorce decree was still in effect and that Georges would still receive his percentage from the sale of the property, minus the $10,000 partial payment.

{¶ 29} Even if the jury chose not to believe any of Hiam's testimony in finding her guilty, the only other testimony tending to prove the "knowingly" element was from Georges. Although he testified that he received a phone call from Hiam requesting that he sign the documents only moments after the gentleman with the documents left his apartment, does not establish that Hiam knew what the documents said or what legal effect those documents would have on Georges's interest in the property. Hiam was attempting to

refinance the Midvale town home, which was allowable under the divorce decree, to pay off her debts.

{¶ 30} Hiam contacted a Utah title company to handle the transaction and based on conversations with Inwest, discovered that Georges needed to agree to the refinancing for the transaction to be completed. What the evidence did not prove or was insufficient to prove was that Hiam knew that the documents Inwest drafted and delivered to Georges directly or indirectly through Greco at Titleco would extinguish Georges's interest in the subject property. Hiam repeatedly testified that the title company and "Vicky [presumably Vicky Robbins] said the $10,000 is part of the 38 percent that he's gonna get."

{¶ 31} The State implicitly asserted at oral argument that Hiam was a sophisticated mortgagor because this was not the first time she obtained a mortgage. However, it is purely presumptuous and speculative on the State's part to infer that merely because a person has obtained a mortgage in the past, renders that person a "sophisticated mortgagor." This inference imputes professional knowledge to a lay person, but absent some additional evidence or testimony establishing that Hiam understood the legal ramifications of the documents Inwest drafted for Georges to sign and that Hiam continued with the transaction aware of those ramifications, we cannot say, even viewing the evidence in the light most favorable to the prosecution,

that sufficient evidence was presented to establish the culpable mental state of "knowingly" for each of the crimes charged.

{¶ 32} Accordingly, we find merit to Hiam's first assignment of error.

{¶ 33} Finding merit to her first assignment of error, we need not address her remaining assignments of error.[1]

{¶ 34} Judgment of convictions reversed. The trial court is instructed to enter a judgment entry vacating Hiam Soueidi's convictions.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

---

[1]Hiam's remaining assignments of error are:

"II.   Hiam Soueidi's convictions are against the manifest weight of the evidence.

"III.   The State violated Hiam Soueidi's Constitutional right to a fair trial when it introduced an irrelevant and highly inflammatory email and photograph.

"IV.   The trial court denied Hiam Soueidi a fair trial and misapplied evidentiary rules on expert testimony when it permitted Lina Soueidi to opine on the legal implications of a[n] Utah conservatorship in Ohio.

"V.   The trial court erred and violated Hiam Soueidi's Constitutional right to a fair trial when it admitted irrelevant evidence about Maya's alleged involvement in a band and when it permitted the State to impeach Hiam Soueidi on this collateral issue with extrinsic evidence.

"VI.   The trial court erred when it found Georges Soueidi competent to testify and that he could do so without an interpreter.
"VII.   The cumulative errors committed in this case deprived Hiam Soueidi of a fair trial."

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


KATHLEEN ANN KEOUGH, JUDGE

JAMES J. SWEENEY, P.J., and
EILEEN A. GALLAGHER, J., CONCUR