[Cite as *State v. Soueidi*, 2011-Ohio-3579.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No.   95353

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MAYA SOUEIDI

DEFENDANT-APPELLANT

---

## JUDGMENT:
## REVERSED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No.   CR-529201

**BEFORE:**   Keough, J., Sweeney, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**   July 21, 2011

**ATTORNEY FOR APPELLANT**

Brett M. Mancino
Ritzler, Coughlin & Paglia, Ltd.
1360 East Ninth Street
1000 IMG Center
Cleveland, OH 44114

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY:   James D. May
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

KATHLEEN ANN KEOUGH, J.:

{¶ 1}  Defendant-appellant, Maya Soueidi ("Maya"), appeals her conviction of securing writings by deception.  For the following reasons, we reverse, vacating her conviction.

{¶ 2}  In October 2009, Maya was charged with theft by deception pursuant to R.C. 2913.02(A)(3) and securing writings by deception pursuant to R.C. 2913.43(A), each containing a furthermore specification that the value of the property was more than $25,000 but less than $1,000,000 and that the

victim was disabled. The matter proceeded before a jury where the following evidence was presented.

{¶ 3} Georges and Hiam Soueidi were married in 1985, had three daughters, and resided in Utah. In 1999, Georges and Hiam were involved in a terrible automobile accident where Georges suffered significant head trauma that left him in a coma for six months. When he came out of the coma, it was revealed that Georges had suffered substantial, permanent brain damage. Following the accident, Hiam quit her job to care for Georges. She was also appointed conservator over him, and was responsible for his personal and financial affairs. Because of his injury, Georges's personality changed and he became verbally and physically abusive to Hiam and their daughters. In 2007, Hiam separated from Georges and filed for divorce. When Hiam filed for divorce, Georges moved to Cuyahoga County to be closer to his siblings.

{¶ 4} In December 2007, Bachara and Lina Soueidi, Georges's brother and sister-in-law, petitioned a Utah court to accept the resignation of Hiam as conservator and appoint them successor co-conservators over Georges. The court granted their petition in January 2008.

{¶ 5} The trial testimony established that Georges lives independently in an apartment in Strongsville. He signed the lease to his apartment without the help of his co-conservators, but with the assistance of his other

brother, Nemr Soueidi. Georges is able to walk freely and independently to local stores and establishments. According to Georges, he has friends in the apartment complex, including his friend "Fred." Georges has obtained his own cell phone and opened his own credit card and checking accounts, without the assistance or knowledge of his co-conservators.

{¶ 6} The testimony established that Georges receives $1,768 in disability benefits from an insurance policy through his former employer, which is enough for him to live on. When his check arrives, Georges signs and Bachara cashes it to pay for Georges's rent and medications. Lina testified that if Georges does not take his medications, he can get "mean." He has difficulty regulating his emotions and can easily become upset or very emotional and even volatile under certain conditions. Georges has screamed at Lina and even threatened her in the past. Additionally, Georges filed a police report accusing Lina and Bachara of "taking his money and jewelry."

{¶ 7} Georges and Hiam's divorce was finalized by a Utah court in March 2009. Hiam was awarded sole physical custody of their minor daughter, age 14. Georges was not ordered to pay monthly child support; Hiam was solely responsible for providing for their three children. As part of the divorce decree, Hiam was awarded exclusive use and possession of the Midvale town home, located in Utah, until their minor daughter graduated from high school; the divorce decree provided that "reasonable efforts will be

made to sell the property in a timely fashion." The divorce decree further provided that when the town home is sold, Hiam is to receive 62 percent of the proceeds from the sale and Georges is to receive the remaining 38 percent. Until the house was sold, Hiam was entitled to "additionally encumber the [Midvale town home] up to her interest in the property." According to both Hiam and Georges, the Midvale town home is valued at $300,000.

{¶ 8} By the time the divorce was finalized, Hiam needed a loan to pay her legal fees, other bills, and the children's medical bills and educational costs. Sometime between the finalization of the divorce and June 2009, she contacted a Utah title company, Inwest Title Services, Inc. ("Inwest"), and inquired about taking an additional mortgage on the Midvale town home to help with these debts. According to Hiam, Inwest informed her that she could not receive an additional mortgage on the Midvale town home unless Georges also agreed to the loan because of his share in the house. Hiam testified that Inwest advised her that Georges had a lien on the property. Hiam testified that she gave Inwest Georges's contact information, which included his cell phone number and address, and that Inwest handled the entire transaction. Hiam did not give Inwest Lina or Bachara's contact information, or advise Inwest that Georges was under a conservatorship. To facilitate the loan, Inwest drafted all necessary documents for Georges to sign, including a Special Warranty Deed ("Deed") and an "Instruction Letter

and Hold Harmless Agreement."   Hiam did not create these documents nor did she receive a copy of them.   No one from Inwest testified at trial.

{¶ 9}   Around the time Hiam was trying to obtain the loan, Lina and Bachara had a month-long trip scheduled to Lebanon for a family wedding. Although they purchased a plane ticket for Georges, he decided not to travel to Lebanon, but stay home under the supervision of his brother Nemr.   Lina testified that she had no concerns leaving Georges for the month.   Lina left on June 24th and Bachara left on July 1st.   According to Hiam, while Lina and Bachara were in Lebanon, Georges called her and said he needed help because his brother and sister-in-law had gone to Lebanon and he had no money.   Hiam testified that she told their eldest daughter, Maya, to fly to Ohio to help her father because she was concerned about his living conditions.

{¶ 10} In June 2009, Inwest contacted Titleco Title Agency ("Titleco") in Middleburg Heights, Ohio to notarize Georges's signature on the Deed.   Kim Beth Greco ("Greco"), owner of Titleco and a notary public, testified that she notarized Georges's signature on two different documents on two different days.

{¶ 11} On June 26, 2009, Georges and another "gentleman," (later identified as Fred), came to her office.   At this meeting, Georges signed the Deed conveying his interest in the Midvale town home to Hiam.   According to

Greco, a special warranty deed is a deed that conveys title to property; it is "how you give something away that you own."

{¶ 12} The Deed provided in bold upper case letters: "THIS SPECIAL WARRANTY DEED IS GIVEN AS FULL SATISFACTION OF ANY EQUITY LIEN SET FORTH IN THE TERMS OF THAT CERTAIN DECREE OF DIVORCE FILED JUNE 3, 2009, AS CASE NO. 074905498, FILED IN THE THIRD DISTRICT COURT, WHEREIN HIAM SOUEIDI APPEARS AS PETITIONER AND GEORGES M. SOUEIDI APPEARS AS RESPONDENT." Greco testified that she could not recall if Georges brought the deed with him or if she received it from Inwest directly. According to Greco, when Georges and Fred came to the office, Georges began showing her pictures of his family. She testified that as they were talking about the document, Georges "got a little — him and the other gentleman had a conversation. Unfortunately I don't know what it was and — it was in a different language — Georges got upset and Georges left. They left after they signed." Greco testified that Georges initially spoke English but "then as he got a little agitated it was a different language," which she found to be a "little strange." She also described Georges as "elderly" based on his motions and how he walked and talked with her. According to Greco, the entire appointment lasted 45 minutes. Greco then sent the Deed to Inwest.

{¶ 13} Two weeks later, on July 10th, Georges came back to the title office with his daughter Maya to sign a second document. This document, dated July 9, was in reference to "Hiam Soueidi, Payoff of Decree of Divorce Instruction Letter and Hold Harmless Agreement." The document purported to be a letter to Vicky Robbins of Inwest from Georges (1) instructing Inwest to record the previously executed deed, (2) acknowledging that he would receive a check for $10,000 if and when Hiam's refinancing was completed, and (3) holding Inwest harmless. The testimony established that Georges did not draft this letter; in fact, Greco testified that she received this letter via email from Inwest Title and there was no suggestion that Georges drafted or could have drafted the letter. According to Greco, Maya and Georges spoke in a foreign language to each other and their conversation was "elevated." After Georges signed and Greco notarized the letter, Maya and Georges left. The entire meeting lasted five to ten minutes. Greco then sent the document to Inwest as instructed.

{¶ 14} Georges, who was deemed competent to testify at trial, testified that a man came to his apartment requesting that he sign a "paper." Fred read the paper and told him not to sign the "paper" because it was from his wife. Georges asked the man for his address and told him that maybe he would call him. Georges then testified: "[A]nd after maybe five minutes, my wife she call me: Why you never call? Sign the paper. I tell her: Okay,

I want to sign, sign. But you must tell Fred the address. She talk with Fred the address. And she talk with Fred. You give them address. She give them address, I go me and Fred to the woman and I sign. I give her the paper for me, drive license Utah."

{¶ 15} Georges also testified about signing a document when his daughter Maya came to visit. "And after Maya, when she come also, they call me from Utah, a man. And they tell me: You must go sign the paper. I tell him, I don't understand English and he tell me wait, maybe I bring a woman to speak with you Arabic. I tell him, yes. She come, a woman. She speak Egyptian. I understand, you know. I am Lebanese. I understand Egyptian, Saudi. She come; blah, blah, blah, blah. She come, start talk, talk, talk, and I start talk with her in English. I tell her: I am disabled, what you want from me? You want me to sign or not – no, she tell me, no, you must sign. Okay. I sign. I sign. Maya, she take me. And I sign."

{¶ 16} After Georges signed the documents, Hiam eventually received a loan for $150,000 and Georges received a $10,000 check dated July 28, 2009 issued by Inwest, with the notation "satisfy divorce decree" in the "memo" area of the check. According to Hiam, it took her three months to obtain the loan.

{¶ 17} Hiam, who is neither an attorney nor works in real estate, testified that she believed the divorce decree was still in effect and that the

$10,000 was an advance on Georges's 38-percent interest in the sale of the Midvale town home. She stated that Inwest also advised her that the $10,000 was a part of Georges's 38 percent interst. Hiam testified that she intends to comply with the divorce decree when she sells the house. Hiam also testified that she did not prepare any of the documents that Georges signed, nor did she receive copies of those documents. She stated that she needed a loan, she contacted a title company, and "they did their job."

{¶ 18} When Lina and Bachara returned from Lebanon, Georges showed them the $10,000 check and they immediately took Georges to the Strongsville Police Department where they made a report and criminal charges were subsequently filed against Hiam and Maya.

{¶ 19} The jury found Maya not guilty of theft, but guilty of securing writings by deception, including the furthermore specification. The trial court sentenced her to two years of community control sanctions, but remanded her to the Cuyahoga County jail for seven days. The sentence was stayed pending appeal.

{¶ 20} Maya appeals, raising eight assignments of error challenging her conviction and the admissibility of testimony and evidence submitted at trial.

{¶ 21} In her first assignment of error, she contends that insufficient evidence existed to support her conviction for securing writings by deception.

**{¶ 22}** When a defendant challenges the sufficiency of the evidence, she is arguing that the State presented inadequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Hawn* (2000), 138 Ohio App.3d 449, 471, 741 N.E.2d 594. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, Cuyahoga App. No. 92266, 2009-Ohio-3598, ¶12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 942, paragraph two of the syllabus.

**{¶ 23}** R.C. 2913.43(A), regarding securing writings by deception, provides that "no person, by deception, shall cause another to execute any writing that disposes of or encumbers property, or by which a pecuniary obligation is incurred."

**{¶ 24}** At trial, the prosecution's theory of the case was that Maya deceptively caused her father to execute a writing that disposed of his interest in the Midvale town home property. We find that she did not.

**{¶ 25}** Maya traveled from Utah to Ohio at the request of her mother, Hiam, and possibly Georges. While in Ohio on July 10th, Maya accompanied her father to Titleco so that he could execute a document as requested by

Inwest. The document that Georges executed was State's exhibit three, which was the Instruction Letter and Hold Harmless Agreement purporting to be from Georges and addressed to Vicky Robins of Inwest dated July 9, 2009. The testimony at trial established Georges did not draft this document, nor did Maya bring it with her from Utah. Greco testified that the document was sent to her office by Inwest as an attachment to an email.

{¶ 26} The letter was regarding "Hiam Soueidi, Payoff of Decree of Divorce Instruction Letter and Hold Harmless Agreement." The letter indicated that Georges had already executed the Deed, which the testimony established that Maya had no involvement in procuring. Specifically, the letter stated: "I have provided Inwest Title Services, Inc. with a fully executed Special Warranty Deed dated June 26, 2009 releasing any and all interest I have in this property, including any equitable lien rights under the Decree of Divorce entered June 2, 2009 (and any amendments thereto) in Civil No. 074905498, filed in the Third District Court of Utah, where Hiam Soueidi appears as the Petitioner and I appear as the Respondent."

{¶ 27} Although the letter instructs Inwest to record[1] the previously executed Deed, this recording instruction does not "dispose[ ] of or encumber

---

[1]Contrary to the State's assertion in its appellate brief and at oral argument that the Deed was recorded in Ohio, no evidence was presented at trial that it was recorded in Ohio prior to Greco sending it to Inwest. The transcript pages cited by the State in its appellate brief purporting to evidence such statement do not contain such testimony.

property," which is a required element for a conviction under R.C. 2913.43(A). "In Ohio, a deed does not have to be recorded to pass title. Whether or not recorded, a deed in Ohio passes title upon its proper execution and delivery, so far as the grantor is able to convey it." *Wayne Bldg. & Loan Co. of Wooster v. Yarborough* (1967), 11 Ohio St.2d 195, 212, 228 N.E.2d 841, citing *Baldwin v. President, etc., of Bank of Massilon* (1853) 1 Ohio St. 141. See, also, *In re Estate of Dinsio*, 159 Ohio App.3d 98, 2004-Ohio-6036, 823 N.E.2d 43, _18. A deed must be delivered to be operative as a transfer of ownership of land, because delivery gives the instrument force and effect. *Kinasz-Reagan v. Ohio Dept. Of Job & Family Servs.*, 164 Ohio App.3d 458, 2005-Ohio-5848, 842 N.E.2d 1067, _21, citing *Kniebbe v. Wade* (1954), 161 Ohio St. 294, 297, 118 N.E.2d 833.

{¶ 28} The law in Utah is similar to that in Ohio: delivery and intent are necessary for the conveyance of property. *Hoggan v. Fleming,* 2010 UT App 195. "A conveyance is valid only upon delivery of a deed and present intent to transfer." *Hoggan* at *1, quoting *Winegar v. Froerer Corp.*, 813 P.2d 104, 110 (Utah 1991).

{¶ 29} Therefore, Georges's interest in the property was disposed of when he executed the Deed and Greco sent it to Inwest approximately two weeks prior to signing the instruction letter. There was absolutely no testimony or evidence presented at trial that linked Maya to the execution of

the Deed, and it was Fred who took Georges to Titleco on June 26th. Even so, Fred was not charged with any crime.

{¶ 30} We find that the writing that disposed of Georges's interest in the property was the Deed, upon which Maya had no involvement in procuring her father's signature. Therefore, because the document that Georges signed while in the presence of Maya had no legal effect regarding the conveyance of the property and Georges's interest in the property was disposed of prior to her involvement, Maya could not be convicted for securing writings by deception under R.C. 2913.43(A).

{¶ 31} Accordingly, we sustain her first assignment of error.

{¶ 32} Finding merit to her first assignment of error, we need not address her remaining assignments of error.[2]

---

[2]Maya's remaining assignments of error are:

"II.   Maya Soueidi's conviction is against the manifest weight of the evidence.

"III.   The State violated Maya Soueidi's Constitutional right to a fair trial when it introduced an irrelevant and highly inflammatory email and photograph.

"IV.   The trial court denied Maya Soueidi a fair trial and misapplied evidentiary rules on expert testimony when it permitted Lina Soueidi to opine on the legal implications of a Utah conservatorship in Ohio.

"V.   The trial court erred and violated Maya Soueidi's Constitutional right to a fair trial when it admitted irrelevant evidence about Maya's alleged involvement in a band and when it permitted the State to impeach Hiam Soueidi on this collateral issue with extrinsic evidence.

"VI.   The trial court erred when it found Georges Soueidi competent to testify and that he could do

Judgment reversed.  The trial court is instructed to execute a judgment entry vacating Maya Soueidi's conviction.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


KATHLEEN ANN KEOUGH, JUDGE

JAMES J. SWEENEY, P.J., and
EILEEN A. GALLAGHER, J., CONCUR

---

so without an interpreter.

"VII.   The trial court deprived Maya Soueidi of a fair trial and violated her right to due process when it instructed the jury with an aiding and abetting and conspiracy charge.

"VIII.   The cumulative errors committed in this case deprived Maya Soueidi of a fair trial."