[Cite as *State v. Hardesty*, 2013-Ohio-2120.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                             :

    Plaintiff-Appellee                  :          C.A. CASE NO.   25027

v.                                        :          T.C. NO.   10CR3333

DARREN L. HARDESTY                        :        (Criminal appeal from
                                    Common Pleas Court)

    Defendant-Appellant                 :

                                          :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    24th    day of     May    , 2013.

. . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

BAHJAT M. ABDALLAH, Atty. Reg. No. 0078504, 15 W. Fourth Street, Suite 100, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Darren Hardesty,

filed February 10, 2012. Hardesty appeals from his January 19, 2012 judgment entry of conviction, following a jury trial, on one count of theft (beyond the scope of consent), in violation of R.C. 2913.02(A)(2), and one count of theft (without consent), in violation of R.C. 2913.02(A)(1), both felonies of the fourth degree. The trial court merged the offenses for purposes of sentencing, and the State elected to proceed on count one, theft (beyond the scope of consent). The court sentenced Hardesty to community control sanctions, for a period not to exceed five years, and ordered him to pay restitution, in the amount of $19,567.00, to Harson Investments, a real estate development company doing business as Singer Properties.

{¶ 2} At trial, Alex Kolodesh testified that he and his wife, Shayna, are employed by Singer Properties, and he stated that Hardesty, doing business as Karma Salon and Spa, entered into a five-year commercial lease of space at 6731 Miller Lane in January, 2006, with Singer Properties. Alex identified the parties' Commercial Lease and the accompanying exhibits thereto. Alex stated that Hardesty entered into the lease without reservation, that he was not pressured or threatened into doing so, and that he did not indicate that he did not understand the lease. The lease is dated January 18, 2006, signed by Alex and Hardesty, and each page is initialed by them. The lease provides in part at paragraph 12, "LEASEHOLD IMPROVEMENTS":

> * * * Lessee may improve the premises only upon the written
> approval of Lessor. In the event that Lessor approves any such
> improvements, Lessor shall have the option, at the final termination of this
> Lease and all renewals hereof, to require restoration of the premises to their

former condition or to require Lessee to leave such improvements with the premises. Any such improvement shall be installed in a workmanlike manner and at Lessee's sole cost. * * *

{¶ 3} The lease provides in part at paragraph 21 "Default":

If any of the rent provided for hereunder or any part thereof shall at any time, be in arrears for more than ten (10) days and without any demand being made therefore or if Lessee shall fail to observe any of the covenants, agreements, provisions, or terms and conditions of this lease after written notice or if Lessee shall fail to continuously operate its business during hours normally associated with Lessee's business for more than thirty (30) days or shall abandon or vacate the premises during the term hereof or make any assignment for the benefit of creditors or if the interest of Lessee in said premises is in any manner transferred or should Lessee commit any act of bankruptcy, it shall be lawful for Lessor to enter into the premises and repossess the same and enjoy the same as if this lease had not been made and thereupon this lease shall immediately terminate and be void without prejudice. * * *

{¶ 4} Exhibit B to the lease provides in part:

* * *

All fixtures installed by Tenant shall be new or completely reconditioned. Tenant shall not make or cause to be made any alterations, additions, or improvements, or install or cause to be installed any exterior

signs, floor covering, interior or exterior lighting, plumbing fixtures, or shades, or make any changes to the storefront without first obtaining Owner's written approval and consent which shall not be unreasonably withheld or delayed. Tenant shall present to Owner plans and specifications for such work at the time approval is sought.

Upon termination of this lease, any improvements performed by Tenant to the building of which leased premises form a part, shall become the property of Owner unless specifically otherwise provided. All work to be completed in accordance with the term of this lease shall be done in a workmanlike manner and in conformance with all current city, county, and state building codes, laws and regulations.

**{¶ 5}** Alex testified that in the summer of 2006, Hardesty began operating the Karma Day Spa and Salon. Alex stated Hardesty advised him "that he wasn't getting the kind of traffic flow in there that he thought, at some point, he was going to get," and that he and Hardesty discussed at length reducing the space Hardesty leased to lower his rent. Alex stated that in May, 2010, Hardesty indicated that he "was real excited with making the space smaller and what he could do," and Alex stated that an architect was engaged to plan the expansion of the nail salon next door into a portion of Hardesty's space.

**{¶ 6}** Alex identified a document that provides, "Summer moving sale. All retail products 35 percent off. Help us reduce inventory to prepare for our move. Stock up today and save. In stock product only. No special orders." The document bears the address, website and phone number of the Karma Salon and Spa, and Alex stated that he became

aware of it "around the time that I was having the conversations with Mr. Hardesty about reducing the space and moving forward with what we were going to be able to do towards the future." Alex stated that Hardesty never contacted him about terminating the lease.

{¶ 7} Alex identified a "Notice of Default" sent to Hardesty, by counsel for Singer Properties, dated June 15, 2010, which provides in part as follows:

Pursuant to Section 21 you are in default under the Lease. As a consequence of your default, pursuant to this section, Harson has elected to exercise the following self-help remedies as set forth in the Lease:

1. Terminate the Lease as to the Premises immediately.

2. Will lawfully re-enter the premises without further notice or legal process tomorrow, *June 16, 2010*, repossess the same, and have you removed if you have not done so.

3. Enforce any additional equitable or legal remedies available to Harson for all unpaid rent and utilities.

4. The Premises is to remain "as is," and you are instructed to NOT remove any fixtures, including but not limited to, hair bowls, lighting fixtures, cabinets and countertops. (Emphasis added).

A "TRESPASS NOTICE" is attached to the "Notice of Default."

{¶ 8} Alex stated that he and Shayna went to Hardesty's salon on the morning of June 16, 2010, and found that "much of what was there was removed." Pursuant to the lease, Kolodesh stated that "all of the items that were attached to the space, whether they be on the floor or on the ceiling or on the walls, were to remain with the space. The items that

could be picked up and carried out of there, the personal items, were items that he could remove from the space." Alex testified that Hardesty removed "the commode in the bathroom" as well as the other bathroom fixtures, door locks and knobs, "exit signage," and "fire alarms and fire detection systems." Alex stated that Hardesty was two months behind in his rent at the time that he departed. Alex stated that the space was not rented to a new tenant until March, 2011.

{¶ 9} Vincent Dang testified that he owns and operates the Luxury Nail Spa in space he leases from Singer Properties, and that his space was next to Hardesty's salon. Dang stated that he and Hardesty agreed that Dang could expand his nail salon into some of the space leased by Hardesty. Dang stated that he observed Hardesty, on June 15, 2010, moving items from the Karma Salon and Spa, and he stated that he so advised the Kolodeshes. Dang stated that he purchased all of the equipment in his nail salon, and that if he moved from the location, "[w]hatever belonged to me, I would take it." Dang later clarified that he would not remove items attached to the space such as toilets, light fixtures, fire alarms or door handles. Dang stated that he observed, after Hardesty moved out, that the toilet and sink had been removed from one of the two bathrooms in the portion of Hardesty's space that Dang planned to take over.

{¶ 10} Shayna Kolodesh testified that she provides real estate development and real estate management services for Harson Investments, which does business as Singer Properties. At the time that Hardesty signed the lease, Shayna testified that the space "needed many things, plumbing, electric, drawings, permits, and all the various aspects of the build-out to be performed in order for it to open for business." According to Shayna,

"[t]his was an unusual situation. A lot of times tenants will have their own contractors. In this instance, we offered to do the work for him and pass it through which means not up-charge the bill, we just paid for it, performed the work and then billed him according to what it was." Shayna identified invoices for multiple items including lighting fixtures, doors and hardware, fans, and a water dispenser that were purchased for Hardesty's space.

{¶ 11} Shayna stated that in June, 2010, while having her hair done at Hardesty's salon, she observed the notice of the summer moving sale quoted above. Shayna stated that Hardesty never advised her of his intent to move, and that at the time she believed he wanted to proceed with reducing the space he leased. Shayna stated that after she and her husband were contacted by Dang about Hardesty's departure, she went to the space and found that "[e]verything was gone and what was left was left very hasty and some items were destroyed." Shayna stated that "[t]here were no toilets and no sink" in the bathrooms, that a "lot of light fixtures had been removed," that cabinets were missing from the walls, and that the hardware from the doors had been removed. Shayna stated that she reported the theft to the police. She stated that the items removed were fixtures, that Hardesty did not have permission to remove them, and that Singer Properties retained ownership of them pursuant to the lease. Shayna identified an itemized list of missing items on a spreadsheet that she compiled, based upon documentary evidence in the possession of Singer Properties, and she stated that the total value of the items taken was $20,795.16.

{¶ 12} Hardesty testified that his father financed the salon for him at a cost of $450,000.00, which was "[a]lmost a hundred percent" over budget. He stated that he signed the lease on January 17, 2006, and he opened the salon in August, 2006. Hardesty stated

that he found another space on National Road that was a former salon, and "made the decision that it was going to be necessary to move simply to survive as a business." He stated that he signed a lease for the new space in June, 2010, and began making improvements. Hardesty stated that he sent Singer Properties, "attention Alex and Shayna," a "letter on June 9th explaining to them that the business model that had been in production for the past four years simply was not producing profit. * * * and that I had decided to move locations." Hardesty stated that he did not retain a copy of the letter.

{¶ 13} Hardesty stated that Shayna came into his salon on June 12, 2010 to have her hair done, and that while he was with another client, she approached him with the notice of the moving sale in her hand. Hardesty testified that he informed her that he was moving and asked her if she received his letter. He stated that Shayna denied receiving the letter and left the salon. Hardesty identified the "Notice of Default" that he received, quoted above. Hardesty stated, "* * * All I know to do is to take the things that are required for a secondary smaller space and try to continue with business."

{¶ 14} Hardesty denied taking two toilets from the salon, and he testified as follows:

> One bathroom was removed and the logic behind me doing that was a
> 24-hour notice. The new space had one very out-dated bathroom and I had
> already paid and designed cabinetry for the toilet that was there. And the
> bathroom that I took the fixtures out of were to be encompassed by Vincent
> Dang's new space and there was no bathroom in that location. So, knowing
> that it was going to be demolished or done away with, I took it anyway for

time efficiency. * * *.

We note that at sentencing, the court noted that "the evidence was there were fixtures taken from only one bathroom," and it reduced the amount of restitution from $20,795.16 to $19,597.

{¶ 15} Hardesty further stated, "Items that were taken were like the exit sign because they were not in the new space and for code it is necessary for the new space to get an occupancy permit." When asked who owned the items that he removed, Hardesty responded, "Me. I paid for them." He stated, "the business was dead at this point. There was no way the lease could be finished." Hardesty stated that Detective Hoying contacted him on his cellular phone a few days later and asked him to come in for questioning regarding the theft of items from the salon. Hardesty stated that he contacted his attorney and then "called Detective Hoying back and informed him that I had spoken with my attorney and my exact words to him was anything that had or had not been removed I'm of the understanding I was well within my rights and that was the end of it." On cross-examination, Hardesty testified that he removed light fixtures, sconces, cabinetry, door handles, a toilet and a sink with a custom cabinet.

{¶ 16} Hardesty asserts one assignment of error as follows:

"THERE WAS NOT SUFFICIENT EVIDENCE PRESENTED AT TRIAL TO SUSTAIN THE JURY'S FINDING OF GUILT, AND IF THERE WERE, THE WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE JURY'S FINDING."

{¶ 17} According to Hardesty, he "owned the property in question. One cannot be charged with stealing what is his." Regarding his lease, Hardesty asserts that the "State

did not provide any evidence, via expert testimony, layman testimony, exhibits, or otherwise to assist the Jury in determining what 'fixtures' or 'improvements' means or how those two terms may or may not be related, or what may or may not trigger 'termination.'" Regarding the distinction between improvements and fixtures, Hardesty asserts that the "only evidence somewhat related to this issue is [Dang] testifying that as a commercial tenant * * * of Singer Properties, he feels anything he buys is his, and he would remove his property with him if [he] were to move." Hardesty asserts that since the "pertinent legal terms of art contained in the contract are not defined," the jury was unable "to make a proper determination of ownership." He asserts that the lease is "insufficient to sustain the jury's finding that Singer Properties 'owned' the property in question," and the "only other evidence presented pertaining to ownership clearly demonstrates that Darren paid for the items in question." Hardesty asserts that he "enriched Singer Properties not deprived them of property, since a lot of his valuable property was left at the premises."

{¶ 18} Hardesty further asserts that the "only piece of evidence the State relies [on] in support of the knowing element is this notice sent by Singer Properties' attorney that demands Darren immediately vacate the premises and leave everything behind." He further asserts that the "attorney letter demands Darren not remove any fixtures, where the lease addendum only stated that 'improvements' become the property of Singer Properties." Finally, Hardesty asserts that "[e]ssentially, the issue of ownership boiled down to the Jury interpreting ambiguous contract language contained in the lessor-lessee agreement. The jury was charged with determining what constitutes 'improvement' in a commercial real-estate setting."

{¶ 19}  The State responds that the "evidence showed that Darren Hardesty entered into a lease agreement that spelled out in understandable language that, upon termination of the lease, whatever improvements he had made to the building would become the property of Singer Properties."

{¶ 20}  As this Court recently noted:

When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn* (2000), 138 Ohio App.3d 449, 471. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.

Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that

the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175. *State v. Hammock*, 2d Dist. Montgomery No. 24664, 2012-Ohio-419, ¶ 11-12.

**{¶ 21}** R.C. 2913.02(A) provides:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent.

**{¶ 22}** "'Property' means any property, real or personal, tangible or intangible, and any interest or license in that property." R.C. 2901.01(A)(10)(a). "'Owner' means, unless the context requires a different meaning, any person, other than the actor, who is the owner of, who has possession or control of, or who has any license or interest in property or services, even though the ownership, possession, control, license, or interest is unlawful." "A person acts purposely when it is his specific intention to cause a certain result." R.C. 2901.22(A). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A

person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22 (B). "Deprive" means to "withhold property of another permanently" or to "dispose of property so as to make it unlikely that the owner will recover it." R.C. 2913.01(C)(1),(2).

{¶ 23} We initially note that in instructing the jury, without objection, the court properly set forth the elements of the charged offenses, defining the terms property, owner, purposely, knowingly, and deprive, and that instructions regarding the definitions of fixtures, improvements and termination were not requested by Hardesty. Having reviewed the lease, we conclude that any distinction between "improvements" and "fixtures" is one without a difference.

{¶ 24} However, as to the issue of termination and ownership, Paragraph 21 of the lease provides that upon default, "it shall be lawful for Lessor to enter into the premises and repossess the same and enjoy the same as if this lease had not been made and *thereupon* this lease *shall immediately terminate* and be void without prejudice * * * ." By the express (and executory) terms of the lease, the improvements or fixtures were to become Singer Properties' upon termination of the lease. In other words, Hardesty was contractually bound to transfer ownership of the improvements or fixtures to Singer Properties by leaving them behind upon vacating the premises. He breached his contractual obligation to do so, on June 15, 2010, prior to Singer Properties' June 16, 2010 repossession of the premises and termination of the lease, with the result that the improvements or fixtures never became the property of Singer Properties. Even though the "Notice of Default," dated June 15, 2010, purported to terminate the lease immediately, the terms of the lease govern the parties'

respective ownership rights, and it did not provide for termination until repossession occurred, which happened on June 16, 2010. Since Singer Properties would not have become the owner of the fixtures and improvements until June 16, 2010, and removal occurred on June 15, 2010, we conclude that the State presented insufficient evidence of theft in violation of R.C. 2913.02. A breach of contract occurred, not a theft, on June 15, 2010. Hardesty's sole assigned error is sustained, and the judgment of the trial court is reversed and vacated.

. . . . . . . . . .

FAIN, P.J. and WELBAUM, J., concur.

Copies mailed to:

R. Lynn Nothstine
Bahjat M. Abdallah
Hon. Dennis J. Langer